

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-12-00092-CV**

IN THE INTEREST OF K.D.C. AND
B.J.D.C., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant P.D.C. (Mother) appeals the judgment terminating her parental

rights to two of her children, K.D.C. (Carl) and B.J.D.C. (Brandon).[2]  In one

---

[1]*See* Tex. R. App. P. 47.4.

[2]Except for employees of the Department of Family & Protective Services (the Department) and service providers, we use aliases to protect the identities of the individuals involved in this case.  *See* Tex. R. App. P. 9.8(b)(2).

issue,[3] Mother argues that the evidence is legally and factually insufficient to support the trial court's statutory endangerment and best interest findings. We affirm.

## II. Background

Fourteen witnesses testified at the bench trial in early January 2012. Several witnesses, including Mother, testified with the assistance of an interpreter.

### Mother

Mother was thirty years old at the time of trial. She testified that she had eight children, and she listed them by name and date of birth. Mother identified her children as Carol, age ten; Carl, age seven; Isaac, age six; Candace, age five; Brandon, age three; Erica, age two; Christopher, age one; and Lauren, age four months. Mother last saw Carol about eight years before trial, and she last saw Isaac and Candace two or three years before trial. Mother said that Isaac and Candace lived with Mother's mother and that they were more comfortable with her mother and wanted to continue living with her.

---

[3]Mother also contends she did not receive a fair trial due to the ineffectiveness of her court-appointed attorney and the trial court abused its discretion by not granting her a new trial with different counsel. However, Mother's assignment of error and her entire argument on that issue contained in her original brief, which exceeded the page limit, was withdrawn from her amended brief, and her contention in her amended brief is contained within one paragraph that does not set forth references to the record of the trial or to her motion for new trial or any citation to legal authority. *See* Tex. R. App. P. 38.1(i). Mother filed a motion for leave to file a supplemental brief addressing this issue, which we denied.

Mother testified that she had lived in her current home with her boyfriend, Marcus, for about one year. She met Marcus about two and one-half years before trial. Mother acknowledged Marcus's positive drug test in September 2011 but testified that she did not believe it to be accurate. Mother testified that she had not known Marcus to use drugs and that he had not abused her.

Mother said two of her past boyfriends, Robert and John, had abused her. John is Brandon's biological father. Mother testified that Carl did not live with her when she lived with John and that he did not witness the abuse, but she also said that she was pregnant with Brandon at the time. Mother testified that John would grab her arms, say mean things to her, threaten to take her children away, and deny her visits with her oldest daughter. Mother said that she lived with John in Mexico and that she left Mexico (and John) for good when she was twenty-two or twenty-three years old.[4] She said she thought John might have been killed because of his family's connections to drug trafficking.

Mother testified that she started using drugs, specifically marijuana, when she was sixteen or seventeen years old. She said she first used cocaine in 2008. Mother testified that she had not used marijuana or cocaine since 2008, but she admitted that she had tested positive for cocaine since that time. Mother

---

[4]We note, however, that Mother turned twenty-three in August 2004 and that Brandon was not born until January 2008. Mother also said in another part of her testimony that she last spoke with John, by telephone, in 2002.

3

said the tester told her that the positive result could have been caused by prescription medications.

Mother testified that she had learned about the need for stability in her life and that her status as an immigrant in this country was not a reason to stay in abusive relationships. She added that she felt stable at the time of trial but regretted some of her decisions before Carl and Brandon went to foster care. Even so, Mother denied that the boys were ever in "serious danger" or that they were ever present when her boyfriends had abused her.

Carl and Brandon went to live with Mother's friend Sarah for about four months in 2008 because of Mother's drug use, and Mother regained custody of the boys after working on her Department service plan. Mother was pregnant with Erica at the time.

After Erica was born in June 2009, Mother's friend Tonya agreed to help Mother by caring for Erica. Mother testified that she met Tonya at a bar where they had both worked and that Tonya knew about her drug use because they had used drugs together. Mother acknowledged that Tonya had filed suit to terminate Mother's parental rights to Erica and that the court in that case had suspended her supervised visitations with Erica in December 2010, but Mother denied that the court stopped the visitations because of a positive drug test.

Mother testified that the Department opened this case in January 2010 because she had given her children away, had used drugs, and did not have stable housing. She said the Department referred her to Safe Haven in February

4

2010. She lived there with the boys until the boys went to live temporarily with Tonya before living with Dana, another of Mother's friends. The boys returned to Tonya's home after Dana accused them of trying to inappropriately touch her daughter. The boys' placement with Tonya eventually broke down because of increasing tension between Mother and Tonya about Erica and because of the boys' allegations to Mother that Tonya had hit them. The Department then placed the boys with Martha, another one of Mother's friends. Mother had only known Martha for about two months at that time, and Mother testified that she regretted the suggestion because Martha did not properly care for the boys and abused them.

Mother tested positive for cocaine in March 2010 while she was pregnant with Christopher. She denied cocaine use and testified that her dermatologist said her skin medication could have caused the positive test. Mother tested positive for marijuana use in April 2010, but Mother denied using marijuana at the time. The Department referred Mother to an inpatient drug treatment center when she was about seven months pregnant with Christopher, but Mother did not go because she was afraid of the Department's intentions. She denied that Christopher tested positive for opiates at birth.

Mother said that she had turned to drugs in the past to relax and escape. She testified that she was raped in 2009, became pregnant with Erica as a result of the rape, and turned to drugs to "wipe away" that assault. Erica was born in June 2009. Mother admitted that she had abused cocaine and alcohol after the

5

assault but said she stopped using drugs and drinking when she learned that she was pregnant. Mother testified that she sought treatment at JPS Hospital after the sexual assault under an alias and that the doctors and police officers knew that she had not used her real name. Mother provided the alias she used at JPS and testified that she used that alias along with her real date of birth.[5] Mother testified that she stopped using drugs for good because of her fear of losing her boys forever. Mother did not, however, know her "clean date" and instead testified that it had been "years" since she last abused drugs.

On direct examination, Mother described her efforts to complete her service plan. She had a psychiatric evaluation at JPS Hospital about a week before trial, but the results were not ready by the time of trial. Mother took drug classes and said she had been employed at a convenience store in North Fort Worth for about three months. Mother also testified that she had completed her required individual counseling. Mother said she had been to Alcoholics Anonymous four times, but she also said she did not have a sponsor and that she instead talked to Marcus, her counselor Gloria Vazquez, or someone from Safe Haven. Mother added that she had been to a lot of drug counseling group meetings in October and November 2011. Mother said her caseworker, Tyra Sasita, told her that Lauren, born September 1, 2011, had opiates in her system

---

[5]During the rebuttal stage of the Department's case, the trial court admitted an exhibit prepared by the JPS custodian of records. According to the exhibit, JPS could not locate any record of treatment for a patient matching the name and date of birth Mother provided during her testimony.

6

at birth, but Mother denied that she had used drugs and testified that the positive test could have been caused by prescription pain pills.

Mother said that she lived in a stable home and was mentally fit and that she no longer associated with disreputable people, and she added that she wanted to continue seeing her drug counselor. Mother testified that she had not paid child support during the case but had provided the boys with whatever they had asked for, including food, clothes, toys, and money. Mother testified that she loved Carl and Brandon, that she had fought to keep them for two years, and that she would continue fighting for them.

### Marcus

Marcus is Mother's boyfriend and Lauren's father. Marcus testified that Mother had not used drugs in the two years they had lived together. In fact, Marcus testified that Mother did not have a history of marijuana or cocaine use. Marcus also testified that he had been drug tested three times during the case, that the last two were clean, and that he would be clean if tested again. Marcus's first drug test was positive for amphetamines. Marcus requested that the children live with him after the trial and said he would not allow Mother to see the children if the court so ordered.

### Tonya

Tonya testified that she met Mother in 2008 when she gave Mother, Carl, and Brandon a ride home from a store. She and Mother became close friends, and Tonya transported Mother to and from work and drove Mother and the boys

to the store and the doctor. Tonya said Mother was abusing drugs and alcohol at the time, sometimes when the boys were with her. Tonya also testified that she had concerns at the time about Mother's ability to care for the boys and that she felt Mother was placing the boys in danger.

Tonya said that after Erica was born in June 2009, she and her eighteen-year-old daughter visited Mother and Erica and took six-week-old Erica home with them for the night. Tonya testified that she took Erica back to Mother's house the next day but that Mother would not open the door at first. Mother eventually opened the door just enough to give Tonya the baby's Social Security card and hospital identification bracelet and to tell Tonya to keep the baby. Tonya took Erica with her, talked to Mother a couple of days later, and agreed to Mother's request that she raise Erica as her own.

Tonya testified that she initiated a suit to terminate Mother's parental rights to Erica because Mother backed out of her agreement to sign adoption papers. Tonya said Mother had asked to visit Erica twice in the first three months but did not visit with Erica again until the court ordered supervised visitations as part of the termination suit. Tonya testified that Mother had only three supervised visitations before the court stopped them as a result of Mother's October 2010 positive drug test.

Tonya also discussed the nine months during which Carl and Brandon lived with her in 2010. Tonya agreed to take custody of the boys because the Department had opened this case, but she said she eventually told the

8

Department she could no longer care for the boys because, according to Tonya, Mother had asked the boys to say they were not happy living with Tonya. Tonya testified that she believed Mother was abusing prescription drugs at the time, and she said Mother had asked her who was selling hydrocodone or vicodin.

**Rhonda**

Rhonda has custody of Mother's son Christopher, who was eighteen months old at the time of trial. Christopher had opiates in his system at birth. Rhonda owns a daycare and met Mother through Tonya because Carl and Brandon had attended the daycare while they lived with Tonya. Rhonda testified that a Department employee called her from the hospital when Christopher was born and was told to be at the hospital two days later. Rhonda took Christopher home with her from the hospital, and she said he had never had an overnight visit with Mother. Rhonda testified that Mother visited Christopher at the daycare two to three times per week for the first few months but that Mother had not visited Christopher since February 2011. Rhonda filed suit for adoption and to terminate Mother's parental rights to Christopher in March 2011. The court had ordered supervised visitation, but Rhonda testified that none had occurred because Mother had not attempted to exercise her visitation rights. Rhonda testified that Christopher was doing very well in her home.

**Mother's Counselor**

Gloria Vazquez is a licensed chemical dependency counselor and is a clinical supervisor of MHMR's Opportunidad Program, a Spanish-language

9

chemical dependency assistance program. The Department referred Mother to Vazquez for drug and alcohol classes. Mother told Vazquez that she had five children, but Vazquez learned from a Department caseworker that Mother actually had eight children. Vazquez acknowledged that it was not normal for a mother to have eight children but not have custody of any of them and that it reflected poorly on Mother.

Vazquez testified that Mother started the drug and alcohol program in May 2011 and graduated in October 2011. She said Mother consistently attended group meetings three times per week, more than was required, and "worked the program very well." She also said Mother had voluntarily attended additional classes through December 2011. Marcus had also attended eight parenting education sessions and some individual counseling with Vazquez. The Department referred Marcus to Vazquez because he tested positive for methamphetamines. Despite the positive test, Vazquez testified that she did not think Marcus was a drug addict.

Vazquez testified that Mother was about seven months' pregnant with Lauren when she first disclosed her pregnancy to Vazquez. Lauren was about four months old at the time of trial. Vazquez knew that Mother also hid her pregnancy from the Department but testified that Mother was afraid the Department would also take Lauren away. Vazquez acknowledged that Lauren lived with Marcus's aunt because of Marcus's positive drug test and because of Mother's history of drug use.

Vazquez testified that Mother had a clean drug test on August 5, 2011, and a diluted drug test result on July 19, 2011. Overall, Vazquez was very complimentary of Mother's progress with her drug addiction. When asked to rate Mother on a scale of one to ten, Vazquez testified,

> You know, the problem is I can't ever give anybody a 10, because the disease of addiction is infinite, so I'd say an eight. That's what I would give anybody who completes the program, continuous, has that support and all that, so I'll say an eight. She may be a nine.

Vazquez testified that Mother had also attended monthly individual counseling sessions with her. Mother's service plan required six sessions, and Mother attended seven. Mother also talked with Vazquez about doing all that the Department required of her to get the boys back. Mother had originally worked with Vazquez in 2009, and Vazquez testified that Mother was as stable as she had ever seen her. In 2009, Mother was caring for Carl and Brandon and was using marijuana three to four times per week. Vazquez testified that cocaine was "more a social thing for her." Vazquez added that Mother was a "really bad" drug addict in 2009 but had "come a long way. A long way." She said Mother was just going through the motions in 2009 but had engaged in the process in 2011, and Vazquez attributed the change to Mother's drug-free lifestyle.

Vazquez's sessions with Mother included discussions about instances in which Mother had been a victim of domestic violence, and Vazquez said that Carl and Brandon were present on some of those occasions. Vazquez agreed that an abusive environment was dangerous for the children and that Mother had put the

children into that situation on several occasions. But Vazquez added that it can take time for a person to leave an abusive relationship and that it was a difficult process.

Vazquez said Mother told her that she was not taking her depression medication because she did not want any positive drug tests during the case. Vazquez also said she had relied on Mother to be the historian for Mother's mental health history and disagreed that Mother was a poor historian. Vazquez testified that Mother did not have a problem with prescription drug abuse, and she said that Mother had been prescribed hydrocodone soon after Lauren's birth because of an injury.

On cross-examination, Vazquez testified that she thought Mother last used drugs, specifically marijuana, more than nine months before trial. Vazquez agreed, however, that a diluted urinary drug test in July 2011 caused her to doubt whether Mother had stopped using drugs.

**Julie Alexander**

Julie Alexander, a social worker at Harris Hospital in Fort Worth, described the treatment Mother received during her eight visits to the hospital between May 9, 2011, and Lauren's birth on September 1, 2011. At different visits, Mother reported pain in her ankle, abdomen, knee, and head. Mother received a prescription for pain medicine at only the June 8 visit. Alexander also testified that Mother had, at different visits, reported having eight, five, and four children and that the inconsistent reports suggested that Mother was hiding something.

Alexander added that Mother was enrolled in the CHIP program and could have been receiving free prenatal care from JPS Hospital instead of continually visiting Harris Hospital. Lauren's meconium tested positive for opiates after her birth.

### Angelia Arbuckle

Angelia Arbuckle served as Mother's caseworker beginning in March 2010 after Safe Haven employees reported that Mother had threatened to harm herself. Arbuckle visited with Mother in early March 2010, and Mother told Arbuckle that she had six children. Arbuckle testified, however, that the names and birth dates for two of those six children did not match any of the eight children that Mother identified during her trial testimony. Mother also told Arbuckle that Carl's biological father was killed in 2006 and that Carl had witnessed the shooting.

Arbuckle described Mother's August 2008 Department referral that alleged marijuana use with her children present. Mother tested positive for cocaine on August 5, 2008, and admitted using cocaine. The children were temporarily removed from Mother, and she worked services until they were returned to her in December 2008. Arbuckle testified that Mother was supposed to continue services until June 2009 but that the Department had closed the case because they were unable to locate her. Mother had another Department referral in August 2009, but the allegation was ruled out.

Arbuckle testified that Carl and Brandon were placed with Tonya in 2010 because Mother had tested positive for cocaine and did not have stable housing.

13

Mother lived in a shed at the time with another woman and slept on a mattress on the ground. Arbuckle recommended that Mother get a psychiatric evaluation because Mother reported not taking her prescribed medications, but Mother did not complete the evaluation. Mother also did not show up for counseling.

Mother was hospitalized in April 2010 for complications with her pregnancy with Christopher. Mother tested positive for marijuana in the hospital; she denied using marijuana and said that she lived with people that smoked it.

### Tyra Sasita

Tyra Sasita became Mother's caseworker in February 2011. Sasita described the requirements of Mother's service plan and testified to her opinion that Mother had not completed many of the requirements. Sasita said that Mother had been "sketchy with a lot of details" about her history, so Sasita could not know for sure whether the boys had been in Mother's care when Mother had been abused by prior boyfriends.

Sasita acknowledged that Mother had maintained contact with the Department and that Mother's current home, where she lived with Marcus, was appropriate. But Sasita testified that she had concerns about Marcus because he had tested positive for amphetamines four months before trial. Mother also had not provided confirmation of her employment. Sasita testified that Mother's immigration status prevented her from providing a paycheck as proof of employment but that Mother could have provided a letter from her employer,

which she had not done. Sasita first learned of Mother's employment at the convenience store during the trial.

Mother regularly attended visitations with Carl and Brandon, but Sasita testified that she had concerns about the way Carl spoke to Mother at visitations. For example, Carl told Mother to "be with one daddy, be with one person, so that we won't have to keep changing daddies." Sasita also said that Brandon regularly used profanity at the beginning of the case, and Carl acted more like a parent toward Brandon, intervening on his behalf to try to explain his actions. Sasita acknowledged, though, that Brandon's profane language and Carl's parent-like demeanor were not necessarily attributable to Mother because they had not lived with Mother for two years.

Sasita testified that the boys' foster parents wanted to adopt them. Carl had initially taken depression and ADHD medication but no longer required depression medication; he told his therapist that he was not sad any longer and wanted to stop taking his medication. Sasita also said Carl had received a special award at school and was on the A/B honor roll. Brandon had also improved; he was still a very active child, but he was not using as much foul language and was not hitting other children as often as he had in the past.

Sasita testified that the boys had a very strong bond and looked out for one another and that they also had a strong bond with their foster parents. Sasita said she could readily see that the boys were part of the foster family; that the home was stable, safe, and secure; and that the foster parents met the boys'

15

emotional and physical needs, and she testified that she had no concerns with the placement. She acknowledged that it took a while for the boys to bond with their foster parents, but Sasita attributed the boys' improvement to the stable, loving, and caring foster home environment and added that Carl could be a kid without having to parent Brandon. Sasita also testified that Carl told her that he wanted to stay in that home because he was happy and felt safe and that he wanted to buy a car at age eighteen to visit Mother. Sasita expressed concern about Mother's ability to meet the boys' emotional and physical needs. Sasita testified that she believed termination of Mother's parental rights was in the boys' best interest.

Sasita acknowledged on cross-examination that Mother had negative drug tests in May, October, and November 2011 and that she had records of Mother's attendance at AA meetings in October and November 2011. But because Lauren's meconium tested positive for opiates in September 2011, Sasita testified that she was concerned that Mother had not been drug-free as long as Mother claimed. Sasita also could not agree that Mother had significantly progressed compared to her past life because Mother had not been forthcoming with her during the case, nor had Mother been a reliable historian for past events. For example, Mother hid her most recent pregnancy from the Department for eight months. Sasita added that she inspected Mother's prescription pill bottle during a home visit in September 2011 and calculated that Mother had taken about twice the number of pills she should have taken by that date.

16

**Mother's Sister and Brother-in-Law**

Barbara is Mother's half-sister; she and Mother have the same father. Barbara lives in San Marcos with her husband Jeff and their three children. Mother told Barbara that she was not using drugs and that the Department had taken the boys away from her because she had been in a violent relationship.

Barbara testified that Carl and Brandon should live with her family in San Marcos if they could not be returned to Mother. Barbara, Jeff, and their three children lived in a one-bedroom apartment, but Barbara said they were looking for a new home at the time of trial. Barbara testified that she worked as a nurse aide for the elderly and that Jeff worked for Hayes County on a paving crew. They were both taking college classes. Barbara said Jeff had good benefits through his job, and she testified that they could afford for Brandon to go to daycare if he and Carl lived with them, even without receiving child support from Mother. Barbara added that her father could provide monetary assistance if necessary.

Barbara acknowledged that Carl was not yet walking the last time Barbara saw him and that she first met Brandon in October 2011. Barbara did not know that Mother had eight children; she thought Mother had four children. Barbara also did not know anything about Mother's boyfriend Marcus. Jeff reiterated most of Barbara's testimony and added that he hoped to have a bachelor's degree in applied behavioral science by the end of 2012.

17

**Mother's Father**

Hector is Mother's father. He testified that he could provide financial assistance if Barbara were awarded custody of Carl and Brandon. Hector initially said that Mother's oldest daughter, ten-year-old Carol, lived with him, but he later testified that Carol lived with his niece in Mexico. Hector took custody of Carol when she was born because of concerns that Mother "would go out and leave [the baby] there," and Hector agreed that Carol was in danger at the time. Hector acknowledged Mother's past drug use but testified that she was not an addict. He testified that he believed it best to return Carl and Brandon to Mother because she is "their true mother" but that they should live with Barbara if they could not live with Mother.

**Carl's Therapist**

Dr. Kathy Owen had conducted fifteen therapy sessions with Carl by the time of trial and anticipated that he would continue therapy with her. She testified that Carl was articulate and liked to be positive. She said that Carl reported less aggression than when he started therapy and seemed happier. However, Dr. Owen reported that Carl had expressed anxiety about not being able to stay in his foster home and had said that he had nightmares. Dr. Owen testified that moving Carl would probably be very disruptive for him, that he felt safe and secure in the current placement, and that he felt a strong and secure attachment to his foster parents.

Carl specifically told Dr. Owen that he wanted to visit Mother but did not want to live with her. When asked about how Carl might adjust if placed with a relative, Dr. Owen testified,

> Well, I guess one thing that comes to mind is that I think it would be very difficult for [Carl] in particular to get over his fear, because one of the things he talks about as I've tried to develop with him kind of a timeline of his history and where he was and who he was with and what kind of a home was that or placement, and one of the -- and he has a hard time with it, which is understandable for a child his age -- but, you know, he usually ends up saying something like, well, we lived a lot of places with a lot of different people, and some of them were really bad, and he says that his mother did not live with them a lot of the time. I think to him, [placement with a relative] would feel like and sound like going [back] to that.

For example, Carl told Dr. Owen that he saw his father kill someone and that his father had threatened to kill him. She testified that these traumatic incidents led to anxiety and nightmares that his father would find him in foster care and kill him. Dr. Owen said Carl's anxiety had recently returned as the trial approached.

Dr. Owen testified that Carl was shy, nervous, and reluctant to talk about the past when he started therapy and that Carl exhibited both insecurity and "over-responsibil[ity]" toward Brandon that prevented Carl from being a kid. In contrast, Dr. Owen described Carl as outgoing, extroverted, active, talkative, thoughtful, and giving at the time of trial, and she attributed his change to his relationship with his foster parents.

**Tara Bassut**

Tara Bassut started as the court-appointed special advocate in March 2011. She visited Carl and Brandon about twice each month. Bassut described

Carl as very friendly, talkative, outgoing, and happy. She said he was at peace and comfortable in the foster home and that he liked to talk about school, basketball, and fishing. Bassut said Carl was less excited to see Mother at visitations than he had been at the beginning of the case but that Carl interacted well with Mother and talked and played games with her. She added that Brandon had been happy to see Mother at visitations.

Bassut testified that Carl was taking medication for ADHD and to help him sleep, but he had not needed as much help sleeping in recent months. She said Carl was doing very well in school both academically and with his behavior, adding that Carl was very proud of his citizenship and honor roll awards. Bassut described Brandon as articulate for his age. She said Brandon had been released from speech therapy and no longer used foul language.

Bassut said the boys had been in their current foster home for about eight months, and she testified that they required a consistent, forever home in which they felt comfortable. Bassut opined that she did not believe Mother could provide that for the boys. She thought that the boys were thriving in the foster home and that it would be detrimental to remove them from that environment.

**Danielle**

Danielle, the boys' foster mother, testified that Brandon was very disrespectful when he first moved into her home. He used profane language and wanted to push and fight with Carl. By the time of trial, Brandon was not fighting

20

or pushing other kids as often and was doing well with his vocabulary, and Danielle described him as a "great child."

Danielle said that when Carl first moved into her home, he took anxiety and depression medication, cried a lot, and distrusted her husband and men in general. Carl was also very protective of Brandon. Danielle opined that Carl had blossomed in a safe and loving environment and that removing him could cause him to again become anxious and depressed. Danielle testified that Carl had excessive fear of being removed from her home, and she said that he had somehow learned about an earlier trial date in the case. Carl woke up in the middle of the night, crying and upset, and told Danielle that he did not want to go back to where he had been before. Carl was afraid that the Department would take him away from school the next day and that Danielle would not be the one to pick him up.

Danielle also testified about statements Carl had made to her soon after he began living in her home. Carl said that he had been involved in a lot of violence in the past and that his father had held a knife to his throat and threatened to kill him because he had thrown a toy at the television. Carl also told Danielle that men from different homes he had lived in had spanked him and had put him in a dark closet to discipline him. Danielle admitted, though, that she was not aware that Carl had previously made a sexual abuse allegation that was ruled out by the Department. She also acknowledged that Carl had lied to her in the past.

21

Danielle testified that she and her husband had good jobs, would continue counseling for the boys as needed, and were able to provide for the boys' physical and emotional needs.

**Trial Court's Judgment**

On February 21, 2012, the trial court signed a judgment terminating Mother's parental rights to Carl and Brandon. In addition to finding that termination of Mother's parental rights was in the children's best interest, the trial court found that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and that Mother failed to comply with the provisions of her service plan.

## III. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92

22

(1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21. "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163

S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re*

24

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Statutory Endangerment

Mother argues in the first two parts of her sole issue that the evidence is legally and factually insufficient to support the trial court's findings under family code section 161.001(1)(D) and (E). Because the evidence relating to the trial court's subsection (D) and (E) findings is interrelated, we address the findings together.

## A. Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine the evidence related to the environment of the children to determine if the environment was the source of the endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an

environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects children to a

26

life of uncertainty and instability endangers the children's physical and emotional well-being. *See S.D.*, 980 S.W.2d at 763.

## B. Analysis

Concerning the trial court's section 161.001(1)(D) "endangering environment" finding, Mother points to her own testimony that she regretted some of her past decisions, including that she had made "some really serious mistakes," and argues that the boys were never present when her past boyfriends had abused her. Mother argues that she was last abused in 2009 when Brandon was only a year old and that the only evidence of her drug use with the boys present was in August 2008. In short, Mother argues that the evidence of her past difficulties is too remote and distant to support termination of her parental rights.

Mother argues that the evidence is legally and factually insufficient to support the trial court's section 161.001(1)(E) finding because her last drug use was in 2009, because Lauren's positive opiate exam was caused by pain pills prescribed to her by a doctor, because she had several clean drug tests during the case, because Mother could not have known that Tonya or Martha would abuse the boys while they lived with those women, because Tonya's allegations that Mother used drugs are conclusory, and because the Department did not show that any endangerment of the children was the direct result of Mother's conduct.

27

Mother understandably focuses on the evidence favorable to her, but she largely ignores the evidence that supports the trial court's judgment. For example, Mother testified that she began using drugs at age sixteen or seventeen; Tonya testified that Mother sometimes used drugs and alcohol while caring for Carl and Brandon in 2008; Vazquez testified that Mother was using marijuana three to four times per week while caring for Carl and Brandon in 2009; and there is evidence that Mother abused cocaine, marijuana, or prescription drugs during her pregnancies with Erica in 2009, Christopher in 2010, and Lauren in 2011. Mother had positive drug tests in August 2008 and in March, April, and October 2010, and she had a diluted test result in July 2011. Sasita testified that Mother had taken twice the number of prescription pain pills she should have taken by the date of a September 2011 home visit. *See J.T.G.*, 121 S.W.3d at 125 (noting that parental drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being); *see also In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *7–8 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.) (holding that mother's drug use supported endangerment finding); *In re Z.D.*, No. 02-07-00386-CV, 2008 WL 4354936, at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.").

28

The trial court also heard testimony that Carl had witnessed his biological father's murder and that Carl had explicit memories of his father threatening to kill him. And although no one could definitely say whether the boys ever witnessed Mother being abused by previous boyfriends, there is evidence that Mother was involved in multiple abusive relationships, and Vazquez said that Mother exposed the boys to those types of relationships on several occasions. Moreover, Mother asked Tonya, a woman Mother admitted was using drugs with her in 2008, to raise Erica in 2009 and to take custody of Carl and Brandon when this case began in 2010. Mother also asked that Martha, a woman she had known for only two months, to take custody of the boys, but Martha abused and did not properly care for the boys. Finally, Mother's current boyfriend Marcus tested positive for amphetamines shortly after Lauren's birth in September 2011. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing a child to domestic violence supports an endangerment finding); *see also In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *40 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.) (noting children's exposure to domestic violence and inappropriate caregivers and holding evidence sufficient to support statutory endangerment findings).

Mother's arguments necessarily focus on her alleged improvements in the months leading up to the termination trial, but there was considerable evidence that Mother had exposed Carl and Brandon to abusive relationships and that Carl had vivid memories of being exposed to violence. There was also conflicting

evidence about when, or if, Mother had stopped abusing drugs and prescription medication, and the trial court could have reasonably found that Mother was still abusing prescription medication only four months before trial. Viewing all the evidence in the light most favorable to the termination judgment, and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that the evidence is legally sufficient to support a factfinder's firm conviction or belief that Mother knowingly placed or knowingly allowed Carl and Brandon to remain in conditions or surroundings that endangered their physical or emotional well-being and that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573. Likewise, giving due deference to the factfinder, we hold that the evidence is also factually sufficient to support the trial court's findings. *See* *H.R.M.*, 209 S.W.3d at 108. We overrule the first two parts of Mother's sole issue.[6]

---

[6]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We thus need not address the third part of Mother's sole issue, which challenges the sufficiency of the evidence to support the trial court's section 161.001(1)(O) finding. *See id.*; *see also* Tex. R. App. P. 47.1.

## V. Best Interest

Mother contends in the final part of her sole issue that the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest.

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

31

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

Mother devoted approximately forty pages of her brief and reply brief to a recitation of evidence arguably relevant to the best-interest determination.[7] According to Mother, she had been drug free for at least nine months before trial, had found stability in her life, and had done everything the Department required of her and more. Mother also contends that the boys are not being properly cared for in foster care. Indeed, Mother's best-interest arguments largely hinge on her version of the case as presented through her own testimony as well as through that by Vazquez and Marcus, but questions about Mother's credibility as a witness and whether she had actually stopped abusing drugs permeated the trial and affect the best-interest analysis on appeal.

---

[7]The Department also briefed the best-interest finding at length.

For example, Mother testified that she left Mexico—and her abusive relationship with Brandon's biological father John—for good when she was twenty-two or twenty-three years old, which would have been in 2003 or 2004, but Brandon was not born until January 2008.[8]   In addition, Mother told Arbuckle that she had six children, but two of the six children were different than the eight children Mother identified during her trial testimony.   Mother told her drug counselor that she had five children, not eight.   She hid her most recent pregnancy from her drug counselor and the Department.   Mother testified that she turned to drugs and alcohol after she was sexually assaulted in 2009 and that she sought treatment from JPS Hospital under an alias, but the hospital had no record of providing treatment to a person by that name.

Related specifically to her drug use, Mother testified that she stopped using drugs in 2009 when she learned of her pregnancy with Erica.   But Mother tested positive for drug use in March, April, and October 2010.   Moreover, Lauren's meconium was positive for opiates in September 2011, and Mother may have abused prescription pain medication during her pregnancy with Lauren. Vazquez, Mother's drug counselor, testified that she believed Mother had been drug-free since May 2011, about nine months before trial, but Vazquez admitted that Mother had not been honest with her about how many children she had and about being pregnant in 2011 and that Mother's diluted drug test result in July

_____

[8]Mother also said in another part of her testimony that she last spoke with John in 2002.

33

2011 caused her to doubt whether Mother had stopped using drugs. Mother indisputably had negative drug tests during the case, but the trial court had conflicting information before it from which it could have determined that Mother had not been drug-free for nearly as long as Mother claimed. It was for the trial court to consider and weigh the conflicting evidence; we as an appellate court defer to the trial court's determinations concerning witness credibility and conflicting evidence. See J.P.B., 180 S.W.3d at 573–74 (legal sufficiency); see also H.R.M., 209 S.W.3d at 108 (factual sufficiency).

With these overriding considerations in mind, we apply the conflicting evidence to the relevant Holley factors and hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. Carl and Brandon have lived a difficult life. They were exposed to violence; Mother was abused by at least two boyfriends, one of whom is Brandon's biological father, and Carl has vivid memories of his own father threatening to kill him, shooting another man, and being shot and killed. Carl did not trust men when he first moved to his foster parents' home, suffered from anxiety, and had nightmares that his father would find and kill him.

Carl and Brandon were also subjected to uncertainty, instability, and Mother's drug use. Carl told Mother at a visitation to "be with one daddy, be with one person, so that we won't have to keep changing daddies." Mother was living in a shed when the boys first went to live with Tonya in 2010, and none of the boys' siblings lived with them when they were in Mother's possession. Mother

abused drugs and alcohol while caring for the boys, and Carl exhibited parent-like tendencies toward Brandon at the beginning of the case because the adults in their lives were not fulfilling that role.

Carl would like to visit Mother once he turns eighteen, but he expressed to Dr. Owen and Sasita that he did not want to live with Mother. The boys' emotional welfare had significantly improved because of the stability of the foster home. Carl was taking less medication than before and was excelling in school. Brandon had improved his language and was also doing well. Both boys were very bonded to one another and to their foster family, and the foster parents wanted to adopt them. Sasita attributed the boys' improvement to the stable, loving, and caring foster home environment, and Carl told Dr. Owen that he was worried about not being able to continue living with his foster parents. Dr. Owen testified that moving Carl would probably be very disruptive for him, that he felt safe and secure in the current placement, and that he felt a strong and secure attachment to his foster parents.

Mother's sister asked that the boys live with her and her family in San Marcos. However, Barbara and her family had only a one-bedroom apartment at the time of trial and had spent very little time with the boys in the past. No one questioned whether Mother loved the boys, but Sasita testified to her doubt that Mother could make the changes necessary to properly care for Carl and Brandon. Mother testified that she completed her service plan, was drug free, and had stable and permanent housing and employment and that she provided

35

things to the boys throughout the case. Mother's credibility, though, was a significant issue at trial. But even accepting Mother's testimony about her recent improvement as true, recent improvement alone is not sufficient to avoid termination of parental rights. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (stating that recent, short-term improvements do not conclusively negate the probative value of a long history of drug use and irresponsible choices); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"); *see also In re J.H.*, No. 02-09-00367-CV, 2010 WL 3618712, at *12 (Tex. App.—Fort Worth Sept. 16, 2010, no pet.) (mem. op.) (noting mother's recent improvement but also her inconsistent attempts in past to stop using drugs and holding evidence sufficient to support best-interest finding).

The trial court heard conflicting evidence, and Mother and the Department have vehemently disputed the accuracy and weight of much of the testimony and other evidence presented to the trial court. However, viewing all the evidence in the light most favorable to the termination judgment, and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that the evidence is legally sufficient to support a factfinder's firm conviction or belief that termination of Mother's parental rights to Carl and Brandon is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *J.P.B.*, 180 S.W.3d at 573. Likewise, giving due deference to the factfinder, we hold that the evidence

is also factually sufficient to support the trial court's best interest finding. *See H.R.M.*, 209 S.W.3d at 108. We overrule the last part of Mother's sole issue.

## VI. Conclusion

Having overruled the dispositive parts of Mother's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DELIVERED: October 24, 2013